*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *R.C. and E.P., as parents and* | ) | |
| *next friends of J.C., a minor,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 07-177-P-S* |
| | ) | |
| *YORK SCHOOL DEPARTMENT,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

R.C. and E.P. ("Parents") challenge a decision of a Maine Department of Education ("MDOE") hearing officer ("Hearing Officer") upholding the finding of defendant York School Department ("York" or "District") that their daughter, J.C., is ineligible for special-education services pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and Maine's laws regarding education of exceptional students, 20-A M.R.S.A. § 7001, *et seq. See* Plaintiffs' Memorandum of Law ("Parents' Brief") (Docket No. 30) at 1-2. The Parents ask the court to reverse the Hearing Officer's decision and enter judgment in their favor, requiring York to reimburse them for costs incurred in placing J.C. in King George School, a private therapeutic school in Vermont. *See id.* After careful review of the entire record filed in this case and the memoranda of the parties, I propose that the court adopt the following findings of fact and conclusions of law, on the basis of which I recommend that judgment be entered in favor of York.[1]

---

[1] The Parents were permitted to supplement the administrative record, *see* Memorandum Decision on Motion To Supplement Record (Docket No. 19), following which they filed copies of depositions of E.P. and of Karen E.

## I.  Proposed Findings of Fact

1.      J.C., now 18 years old, was born in 1990.  Special Education Due Process Hearing [Decision] ("Hearing Decision"), *[P] & [C] v. York Sch. Dep't*, Case No. 07.100H (Me. Dep't of Educ. July 23, 2007), at 2, ¶ 1; Administrative Record ("Record") at 403.[2]  Her mother, E.P., has taught in York's early elementary schools for 21 years.  Hearing Decision at 2, ¶ 1; Testimony of E.P. ("*E.P.*") at 90-91.[3]  Her father, R.C., lives in Cape Neddick, Maine, teaches middle-school science in Lexington, Massachusetts, and has been an educator for more than 25 years.  Hearing Decision at 2-3, ¶ 1; Testimony of R.C. ("*R.C.*") at 438, 483.  Although the Parents separated in 1999, they maintain an amicable relationship and are both very involved in J.C.'s life.  Hearing Decision at 3, ¶ 1; *E.P.* at 187-88, *R.C.* at 440-41, 445.  J.C. primarily has lived with her mother since her parents' separation.  *R.C.* at 440-41.

2.      J.C. has always been a very spirited child.  Hearing Decision at 3, ¶ 2: *E.P.* at 93 (describing J.C. as a "spicy enchilada").  She was a very bright young girl with a theatric flair and a bubbly personality.  Hearing Decision at 3, ¶ 2; *E.P.* at 96, 103.  She has always required a lot of attention from her parents and has had a defiant nature her whole life.  Hearing Decision at 3, ¶ 2; *E.P.* at 93.

### A.  Elementary School

3.      J.C. attended Coastal Ridge Elementary School ("Coastal Ridge") in the District. Hearing Decision at 3, ¶ 3; Record at 595.  Her mother was concerned that, although she

---

Fitzhugh, Ph.D., *see* Deposition of E.P. ("E.P. Dep.") (Docket No. 21); Telephone Deposition of Karen E. Fitzhugh, Ph.D. ("Fitzhugh Dep.") (Docket No. 22).

[2] For ease of reference, I shall refer to the Hearing Officer's decision, contained at pages 911-33 of the Record, as "Hearing Decision," citing the consecutively numbered pages of the Hearing Decision itself rather than Record pages.  I have drawn my proposed facts from the Hearing Officer's findings, supplemented by additional information, including facts proposed by the District and the Parents, to the extent the findings and additional information are relevant, or useful by way of background, and are supported by a preponderance of the evidence.

[3] When citing hearing testimony, I shall refer to the consecutively numbered pages of the hearing transcript, contained at pages 934-1206 of the Record, rather than to Record pages.

appeared very bright and her work was beautifully done, she struggled with reading and did not progress at the same pace as her peers. *E.P.* at 94-95. She was always the last to complete assignments. *Id.* at 95. J.C. was well-liked by her peers because of her theatrical and entertaining personality, but she never kept friends for long. Hearing Decision at 4, ¶ 6; *E.P.* at 103-04.

4.    When J.C. was in the third grade (1989-99), her parents referred her for testing for a suspected learning disability. Hearing Decision at 3, ¶ 3; Record at 596. In September 1998, Dr. Eva Powers conducted a psychological evaluation of J.C. Hearing Decision at 3, ¶ 3; Record at 589-94. Although J.C.'s full-scale IQ was 112, high average, and her verbal comprehension score was superior, her scores revealed relative weaknesses in short-term memory, sequential ability, and processing speed. Hearing Decision at 3, ¶ 3; Record at 591-93. Dr. Powers recommended emphasizing basic concepts before adding details and providing J.C. with all needed information to minimize memory requirements. Record at 594.

5.    At a Pupil Evaluation Team ("PET") meeting in October 1998, the PET did not find J.C. eligible as a student with a disability under the learning disability category. Hearing Decision at 3, ¶ 4; Record at 581-83. The Parents did not sign a portion of the form that PET members were to sign to indicate agreement with the decision. Hearing Decision at 3, ¶ 4; Record at 583.[4] At the meeting, E.P. informed the team of J.C.'s belief during the prior year that "she couldn't do anything – reading, spelling, math or making friends[,]" and that her "discouragement was generalizing into a feeling of no ability in other areas." Record at 578. J.C.'s third-grade teacher described her as "sparky and upbeat." *Id.* at 579.

---

[4] Nonetheless, when asked at hearing whether she agreed with the PET's 1998 decision, E.P. testified: "[W]as I in agreement? Probably I was." *E.P.* at 100.

6.      In the third grade, J.C. received all As and Bs in her classes and was rated as "satisfactory" or "outstanding" in work habits and in social development, including accepting responsibility, following school rules, demonstrating self control, and being thoughtful and courteous.  Record at 556.

7.      The Parents separated in April 1999.  *E.P.* at 102.  While the separation was hard for the whole family, J.C. appeared to handle it better than anyone else.  *Id.*

8.      In the fourth grade (1999-2000), J.C.'s reading fluency continued to be a concern, despite weekly after-school tutoring from her teacher, Ms. Bradburn.  *Id.* at 101.  Her academic work continued to take her so long to complete that she could not participate in extracurricular activities.  *Id.* at 104.  J.C. again received all As and Bs in her classes and was rated as "satisfactory" or "outstanding" in work habits and in social development.  Record at 551.

## B.  Middle School

9.      In the fifth grade (2000-01), J.C. began attending York Middle School.  Hearing Decision at 3, ¶ 5; *E.P.* at 105-06; Record at 550.  She had a fabulous year academically.  *Id.* She loved her teacher and earned straight As, with excellent marks for social development and work habits.  *Id.*

10.     E.P. has described the sixth grade (2001-02) as the "beginning of the nightmare" for J.C.  *E.P.* at 107.  J.C. spent considerable time on projects, working on them until the last minute in an attempt to make them as perfect as possible.  *Id.*  These projects took an emotional toll on J.C.; she typically would get frustrated, cry, and rip up her work.  *Id.*  She developed anxiety about school and became "edgy, sassy, [and] difficult" at home.  *Id.* at 107-08.

11.     During the sixth grade, J.C. began to mature physically, which caused boys to pay attention to her.  Hearing Decision at 4, ¶ 7; Record at 272.  She began feeling depressed and

4

started cutting herself. *Id.* She later explained, "my depression revealed itself and began to change me." Record at 272. That year, she consumed her first alcoholic drink. Hearing Decision at 4, ¶ 7; Record at 272. At the time, the Parents were not aware that J.C. was suffering from depression, cutting herself, or drinking. *E.P.* at 109-10; *R.C.* at 442-43. When R.C. tried to set limits for J.C., she responded with defiance and rage, becoming emotionally and physically abusive to him. *R.C.* at 443-44. In school, J.C. did very well, achieving all As and Bs, and she had excellent attendance and behavior, Hearing Decision at 4, ¶ 7; Record at 549, receiving marks of 1 (outstanding) and 2 (satisfactory) for conduct and work habits, Record at 549.

12.     J.C.'s feelings of depression grew worse during the seventh grade (2002-03). Hearing Decision at 4, ¶ 8; Record at 272. In her own words, her depression "took over." Record at 272. She began dressing provocatively to continue to get attention from boys and became involved with her first boyfriend, Hearing Decision at 4, ¶ 8; Record at 272-73, an older boy whom her mother believed to be "big trouble" and "a loser boy," *E.P.* at 111-12. J.C. began experimenting with sexual activity, and her boyfriend disclosed their intimate relations to others at school, making J.C. feel "disgusting." Hearing Decision at 4, ¶ 8; Record at 273. She continued cutting herself, snuck out of the house to meet her boyfriend, and tried marijuana for the first time. Hearing Decision at 4, ¶ 8; Record at 273; *E.P.* at 412. She even wrote a suicide note, later revealing that she then felt that "the world and our family would be better off without me." Hearing Decision at 4, ¶ 8; Record at 274. She considered this to have been her most difficult year emotionally. *Id.* At home, E.P. found J.C. to be even more oppositional, "surly and rude." *E.P.* at 410-11.

13.     That year, E.P. learned of J.C.'s cutting behaviors from Wendy Gailey, a school counselor at York Middle School. Hearing Decision at 8, ¶ 4; *E.P.* at 112. E.P. immediately

sought therapy for her daughter.  Hearing Decision at 8, ¶ 4; *E.P.* at 112-13.[5]  J.C. began

attending therapy sessions with counselor Bobbie Gray in April 2003.  Hearing Decision at 4,

¶ 8; *E.P.* at 113; Record at 373.  Gray recorded in her notes that E.P described the purpose of the

counseling as "to work with [J.C.] to see her dad and [to address] concern about [J.C.'s] choice

of friends."  Hearing Decision at 4-5, ¶ 8; Record at 374.  J.C. expressed continuing feelings of

loss about her parents' divorce.  Hearing Decision at 5, ¶ 8; Record at 375.

14.    Because J.C. was cutting herself, Gray recommended that she see Joshua Gear,

M.D., a psychiatrist.  Hearing Decision at 5, ¶ 9; Record at 332-33.  She began seeing Dr. Gear

in May 2003.  Hearing Decision at 5, ¶ 9; Record at 205.  At that time, Dr. Gear diagnosed her

with an anxious depression and an Attention Deficit Disorder, complicated by family and

developmental issues.  Hearing Decision at 5, ¶ 9; Record at 205, 337.[6]  He initially prescribed

Effexor for depression.  Hearing Decision at 5, ¶ 9; Record at 436.[7]

15.    In the seventh grade, J.C.'s school attendance was good, and she earned mostly

As and Bs, with a C for one trimester in physical education and for one trimester in math.

Hearing Decision at 4, ¶ 8; Record at 545.[8]  She again received marks of 1 and 2 for her conduct

and work habits that year.  Record at 545.  J.C. also played sports and was on the track team.

Hearing Decision at 4, ¶ 8; Testimony of Kevin David Wyatt ("*Wyatt*") at 677.[9]  That year, she

received five behavior reports: two for public displays of affection with her boyfriend, one for

---

[5] E.P. testified that, after "practically wrest[ling] her to get it and look," she checked J.C.'s arm and found evidence of many cuts.  *E.P.* at 112-13.  E.P. understood that cutting was a way to relieve pain.  *Id.* at 112.

[6] Although the Hearing Officer stated that Dr. Gear diagnosed J.C. in May 2003 with, *inter alia*, Major Depressive Disorder and anxiety, the Record indicates that Dr. Gear initially assessed her with "anxious depression" and had changed the diagnosis as of February 14, 2004, to Major Depressive Disorder following an episode, described below, in which J.C. was hospitalized for depression.  Record at 350.  As of December 30, 2006, Dr. Gear assessed J.C. as "struggling with a complicated combination of ADHD [Attention Deficit-Hyperactivity Disorder] and a Mood Disorder, possibly a bipolar disorder."  *Id.* at 351.

[7] The Hearing Officer stated that Dr. Gear prescribed medication to address J.C.'s depression and ADHD; however, the Record indicates that she was initially prescribed Effexor for depressive symptoms.  Record at 436.

[8] The Hearing Officer mistakenly found that J.C. received an "occasional C in physical education."

[9] Wyatt taught J.C. math in the eighth, ninth, and 10th grades and coached her in track in the seventh and eighth grades and basketball in the eighth grade.  *Wyatt* at 676-77.

failing to report to homeroom, and one for being in an unauthorized area of the school, and another for going swimming without permission during a school picnic. *Hearing Decision* at 4, ¶ 8; Record at 319, 323, 328, 354-55.[10]   J.C. consistently rationalized what she had done to get in trouble, arguing that the rules were stupid. *E.P.* at 114.

16.     These behavioral issues prompted E.P. to e-mail Gailey and ask her to keep an eye on J.C. at school, and caused the Parents to request that a behavior plan be created. Record at 327, 353; *E.P.* at 115, 118. District personnel did not agree that a behavior plan was warranted. Record at 325. Instead, they proposed switching J.C.'s assigned homeroom, reasoning that this was the period of the day when she was "most inappropriate at school." *Id.* R.C. requested a meeting with J.C. and her teachers to address the specific behaviors of concern. Record at 320; *R.C.* at 446-48. At that meeting, J.C. was given an extension on some writing assignments, and teachers promised weekly e-mail communications to the Parents. *R.C.* at 448.

17.     During the summer after the seventh grade, J.C. began sneaking out of the house frequently and lying to her parents about where she was going. *E.P.* at 123-24. She continued to cut herself. *Id.* at 125. E.P. ensured that J.C. continued therapy with Gray throughout the summer. *Id.* J.C.'s friendship circle shifted to an undesirable group of peers. *R.C.* at 449. E.P. felt that J.C. was hanging out with children from "troubled homes" and that adults in those homes "weren't necessarily stepping up to their parenting duties." *E.P.* at 124. J.C. frequently argued with her parents, especially about limit-setting, and screamed at her father. *R.C.* at 449-50.

18.     In the eighth grade (2003-04), J.C. was no longer seeing her boyfriend but continued to use her sexuality to obtain attention from boys. *Hearing Decision* at 5, ¶ 10; Record at 274. She wore sexually provocative clothing, used marijuana regularly, and snuck out of the

---

[10] The Hearing Officer mistakenly found that J.C. had received four behavior reports during the seventh grade.

house at night.  Hearing Decision at 5, ¶ 10; Record at 274-75; *E.P.* at 126.  She was lonely and found temporary comfort in sexual promiscuity with many partners.  Record at 274.[11]  E.P. described her daughter during that year as being "very difficult at home," disrespectful, not following rules, and fighting over her clothing choices.  *E.P.* at 125, 146, 421.  J.C. could appear "happy and cheerful" and was popular at school, but with her parents she showed considerable disrespect and rudeness.  *Id*. at 127, 422.

19.     That year, J.C. got in trouble at school a few times, for not bringing home a progress report, cutting chorus, and being disrespectful to a teacher.  Hearing Decision at 5, ¶ 10; Record at 562-64.  One of those behavior reports, issued in October, described her as wandering the halls instead of attending chorus class.  Record at 564.   The chorus teacher, Susan Frank, sent an e-mail to E.P. in November stating that J.C. was "extremely unhappy in chorus" and that she "just sits there, looking depressed, will not participate, will not move, will not stand up when everyone else does, and has an attitude the minute she walks in."  Record at 316.  Frank reported that when she confronted J.C. about her issues with the class, J.C. was verbally harsh and abusive to her.  *Id*.  Wyatt stated in an e-mail in November 2003 that, although J.C. had "[n]o behavior issues with me, ever[,]" she was "very depressed, and down, and has no self esteem or confidence in math, even though she does well."  *Id*. at 313.

20.     In late 2003, the York DARE officer, Scott Cogger, informed E.P. that J.C. was sneaking out at night to join others to smoke marijuana.  *E.P.* at 129-30.[12]  This was the first time that E.P. became aware that J.C. had been sneaking out of the house.  *Id*. at 421.  Cogger and Assistant Principal Steve Bishop agreed to call J.C. in for a meeting to discuss the issue in

---

[11] The Parents submitted this proposed finding of fact.  *See* Parents' Brief at 8, ¶17.  York protested that the Record did not support that characterization, and that the "obvious overstatement" was improper in this sensitive case.  *See* Defendant's Memorandum of Law ("District Brief") (Docket No. 31) at 8 n.4.  I find the characterization to be supported by the Record.

[12] Cogger's last name evidently is misspelled in the hearing transcript.  *See* Parents' Brief at 9, ¶ 9; Record at 275.

January 2004.  Hearing Decision at 5, ¶ 11; *E.P.* at 130; Record at 570.  When J.C. approached the meeting room and saw her mother, accompanied by the DARE officer and the assistant principal, she sprinted out of the building, heading through crowded hallways and the gymnasium, where basketball practice was in progress.  *E.P.* at 130-31.  Cogger pursued her and physically restrained her.  Hearing Decision at 5, ¶ 11; *E.P.* at 130-31.  In the office, when E.P. explained why they were gathered for a meeting, J.C. reacted like a wild animal, screaming, shouting, and trashing the office.  *E.P.* at 131.  J.C. later wrote: "My immediate response was rage, it was a complete explosion of all my feeling[s] inside.  Three people I didn't want knowing anything that was going on inside of me had found my only small source of comfort besides cutting."  Record at 275.  After her outburst subsided, J.C. sat in a window casement with her knees to her chest in what appeared to be a catatonic state, rocking back and forth while emitting an "eerie, unearthly howling."  *E.P.* at 131-32.

21.     Terrified, E.P. phoned J.C.'s counselor, who advised her to take J.C. to the emergency room.  *Id*. at 132.  J.C. left the school by ambulance.  *Id*.  In the emergency room at York Hospital, an officer was stationed to watch J.C., for her safety and that of the family, until a decision was made to transfer her by ambulance to Spring Harbor Hospital ("Spring Harbor").  *Id*. at 133.

22.     On January 12-13, 2004, Michael Broderick, Ph.D., conducted a psychological evaluation of J.C. at Spring Harbor.  Hearing Decision at 5, ¶ 11; Record at 570.  Her cognitive testing results were consistent with those obtained in previous testing, with a full-scale IQ of 122 (superior).  Hearing Decision at 5, ¶ 11; Record at 571.  Again, there was considerable scatter in her scores, with a verbal comprehension index of 124, which is superior, and a freedom from distractibility index of 87, which is low average.  *Id*.  Dr. Broderick noted J.C.'s "marked

strength" in comprehension, which indicated "an extremely good ability to demonstrate practical information, a superior ability to evaluate and use past experience, and a superior knowledge of conventional standards of behavior."   Record at 572.   He wrote: "Abilities shared with other subtests would suggest . . . good common sense, social comprehension and crystallized intelligence."   *Id.*

23.      Dr. Broderick reported that both the results of both Rorschach and Millon Adolescent Clinical Inventory ("MACI") testing showed "evidence of marked depression" that is not always apparent, "marked antisocial and aggressive/sadistic personality features," "marked, though largely compensatory narcissism" to compensate for low self esteem, and often "highly impaired" social perceptions.   *Id.* at 573-75.   Dr. Broderick found sufficient evidence to warrant a diagnosis of Major Depressive Disorder, noting that there might also be "a double depression with an underlying Dysthymic Disorder that she chronically self-medicates with drugs and vis a vis the cutting behavior."   Hearing Decision at 6, ¶ 11; Record at 575.[13]   He also diagnosed J.C. cannabis abuse and possible alcohol abuse.   *Id.*   His recommendations centered on psychological treatment and dealing with substance abuse.   Hearing Decision at 6, ¶ 11; Record at 575-76.   He noted that J.C.'s characterological features would pose "a major stumbling block to treatment in any modality" and that there might be "a need for a more structured treatment setting" to address her substance-abuse issues.   Record at 575-76.   J.C. left Spring Harbor with a new prescription for Lexapro.   *E.P.* at 140.

24.      Following a six-day inpatient hospitalization at Spring Harbor, J.C. returned home.   *Id.* at 141; Record at 299.   For about two weeks after her discharge from Spring Harbor,

---

[13] Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness[.]" Stedman's Med. Dictionary 556 (27th ed.).

J.C. received in-home support services after school.  *E.P.* at 141.  J.C. later wrote that the "hospitalization only intensified my depression and self loathing.  The rest of the year went in a blur of meaningless hookups, friendship loss, and constant hurt and rejection" by her former boyfriend.  Record at 275.

25.     Academically, J.C. continued to earn As and Bs in the eighth grade, although she received a C and a C+ in English during the second and third grading periods.  Hearing Decision at 5, ¶ 10; Record at 541-42.  She and her English teacher had a personality conflict.  Hearing Decision at 5, ¶ 10; *E.P.* at 145.  She participated in track and basketball that year and did well in both.  Hearing Decision at 5, ¶ 10; *Wyatt* at 677, 681-82.  On her report card, her teachers described her as a "true pleasure to have in class" and as having "outstanding skills and creativity[.]"  Record at 542.  She again received marks of 1 and 2 for her conduct and work habits.  *Id.*

26.     At hearing, Wyatt testified that J.C. was "extremely hard working" and "[v]ery organized[,]" although she did not appear to have much confidence in her math skills.  *Wyatt* at 679.  He described her as "extremely charismatic[,]" a "classroom leader," and "an absolute joy" to have in class.  *Id.*  He further testified that she got along very well with her peers, was comfortable with students from "all sorts of groups" and could transcend barriers that would sometimes divide student groups in school.  *Id.* at 680.  He found her to be a "very good leader" on the track team and "bubbly, outgoing, and charismatic" both in school and during track practice.  *Id.* at 682.  He testified that he believed that his observation in his November 2003 e-mail that J.C. was depressed related to a particular incident that had happened and that, overall, she appeared happy and bubbly at school.  *Id.* at 683.

### C. High School

27.      J.C. transitioned to York High School for the ninth grade (2004-05).  Hearing Decision at 6, ¶ 12; Record at 522.  She had a new boyfriend who did not use illegal substances and treated her with respect, Hearing Decision at 6, ¶ 12; *E.P.* at 150-51, whom her mother described as a "wonderful influence" on her, *E.P.* at 151.  Consequently, she stopped using drugs and alcohol and stopped cutting herself.  Hearing Decision at 6, ¶ 12; *E.P.* at 151; Record at 275.  She was better around the house, was not sneaking out at night, and was less surly.  *E.P.* at 150-51, 427.  As part of her academic schedule, she participated in the learning and resiliency program ("LRP"), a program for children who have potential but are at risk.  Hearing Decision at 6, ¶ 12; *E.P.* at 147.  In the LRP program, which was run by Andrea Warren of York Hospital and Gina Brodsky, the high school's wellness counselor, J.C. was the only ninth grader in a group of tenth graders.  Testimony of Georgina K. Brodsky ("*Brodsky*") at 736-37, 743, 753; Record at 79-80.  The program involved a weekly group meeting, a monthly volunteering experience, and an adventure excursion every other month.  *Brodsky* at 743-44.  J.C. did exceptionally well with this program, and it had a stabilizing effect on her.  Hearing Decision at 6, ¶ 12; *Brodsky* at 752-54; *E.P.* at 149.  She was a bright spot in the group, enthusiastically participating in projects.  Hearing Decision at 6, ¶ 12; *Brodsky* at 752.  By the end of the school year, J.C. became tired of her responsible boyfriend, terminated that relationship, and began seeing a different boy, with whom she smoked marijuana regularly.  Hearing Decision at 6, ¶ 12; Record at 275-76; *E.P.* at 154-55.

28.      In the ninth grade, J.C. earned As and Bs, with a C+ in algebra.  Hearing Decision at 6, ¶ 12; Record at 522.  There was no evidence that she violated school rules or was disciplined during that school year.  Hearing Decision at 6, ¶ 12; Testimony of Susan Macri

("*Macri*") at 643.[14]   Catherine Daley, an English teacher at York High School who served as J.C.'s team leader during her time there and saw her every day, described her as having excellent social skills, being very good at breaking down barriers between different cliques of students, having a great personality, and being "bubbly and upbeat, nice to have around."   Testimony of Catherine Daley ("*Daley*") at 715-17, 723-26.   Daley testified that J.C. seemed more mature than most students and actually more stable in her mood than most.   *Id*. at 728.   Wyatt found J.C. that year to be comfortable, social, transcending lines of different groups, and "still bubbly and smiling."   *Wyatt* at 686.   Brodsky described J.C. as an enthusiastic participant in LRP.   *Brodsky* at 752-53.   J.C. exhibited leadership from the beginning of the class, was humorous, had no difficulty with communication, and seemed to have no emotional difficulties other than normal adolescent ups and downs.   *Id*.   Brodsky received no reports of concerns about emotional or substance abuse issues for J.C. from teachers or others that year.   *Id*. at 757.

29.     J.C. began the 10th grade (2005-06) at Emma Willard School ("EWS"), a private school in Troy, New York, where her mother's family lived.   Hearing Decision at 6, ¶ 13; *E.P.* at 152-53.   The family decided to send J.C. to EWS because the family had a long-term connection with the school and because J.C. wanted to go, having "fallen in love" with EWS during family visits.   *E.P.* at 152-53.   J.C.'s mental health providers supported her enrollment at EWS in the hope that it would provide her with a clean slate and a more positive peer group.   *Id*. at 154-55. J.C. liked the academic challenge, feeling intelligent and that she was working to her potential. Hearing Decision at 6, ¶ 13; Record at 277.   Her grades were very good: she earned As and Bs and a C in biology.   Hearing Decision at 6, ¶ 13; Record at 528-29.   Her grades for performance in the residence halls were "good/excellent" in four out of five areas, including "ability to follow dorm expectations," and "good" in the fifth area, room care.   Record at 535.   She was noted "to

---

[14] Macri was the District's assistant director of special education.   *Macri* at 636.

participate in hall teas with zest and humor, and seem[ed] to be finding a comfortable role for herself within that group."  Record at 535.

30.     While initially EWS seemed like a good fit for J.C., she was very homesick. Hearing Decision at 6, ¶ 13; Record at 276; *E.P.* at 156.  On January 21, 2006, during a school trip to New York City, she was caught shoplifting.  Hearing Decision at 6-7, ¶ 13; Record at 302; *E.P.* at 157.[15]  She was allowed to return to school on probation, but she began cutting herself again and passed out after she drank an entire bottle of liquor with a friend in her dormitory on her 16th birthday, as a result of which EWS dismissed her.  Hearing Decision at 7, ¶ 13; Record at 52, 277; *E.P.* at 157-58.  J.C. returned to York High School in mid-March 2006.  Hearing Decision at 7, ¶ 13; *E.P.* at 158.

31.     On March 10, 2006, following J.C.'s return to York High School, the Parents referred her to the PET to consider whether she was eligible for special education and related services as a student with either a specific learning disability, an emotional disability, or another health impairment.  Hearing Decision at 7, ¶ 14; Record at 519.  The family's referral form noted ADD (Attention Deficit Disorder), depression and anxiety, but not substance abuse.  Record at 519.  The Parents stated that J.C. "achieves high grades at tremendous cost to her emotional well-being."  *Id.*  With E.P.'s consent, evaluations were performed.  Hearing Decision at 7, ¶ 14; Record at 508-17.  Daniel Scuccimarra, M.S., a District psychological service provider, administered a WISC-IV, which again revealed a scatter in J.C.'s subtest scores.  Hearing Decision at 7, ¶ 14; Record at 514.  Her verbal comprehension index was 119, again in the superior range, and her perceptual reasoning index was 112, high average, but her working memory index score was 83, low average.  Hearing Decision at 7, ¶ 14; Record at 513.  J.C.'s

---

[15] The Hearing Officer stated that J.C. was "arrested" for shoplifting, but the Record indicates that she was placed on "house arrest" at EWS following the incident.  *E.P.* at 157.

composite achievement test scores placed her in the 94th percentile, but she scored in the 55th percentile for word reading and pseudoword decoding.  Hearing Decision at 7, ¶ 14; Record at 508-09.  Scuccimarra also administered a Behavioral Assessment System for Children ("BASC") test, on which, based on her parents' responses, J.C. scored in the clinically significant range for attention problems, conduct issues, and depression.  Record at 512, 515.

32.    In May 2006, York also administered a Wechsler Individual Achievement Test ("WIAT") to J.C. to measure her academic achievement.  *Id.* at 508.  Although J.C. achieved scores in the average range or above, the evaluator remarked about her "self-reported desire to sleep, self-reported lack of interest and possible difficulty in filtering out extraneous stimuli."  *Id.* at 510.

33.    The PET convened on May 19, 2006, and evaluated J.C. for the existence of an emotional disability, using a form that asked whether the student had exhibited:

> one or more of the following characteristics that adversely affects [her] educational performance: A. . . . An inability to learn that cannot be explained by intellectual, sensory, or health factors[;] B. . . . An inability to build or maintain satisfactory interpersonal relationships with peers and teachers[;] C. . . . Inappropriate types of behaviors or feelings under normal circumstances[;] D. . . . A general pervasive mood of unhappiness or depression[;] or E. . . . A tendency to develop physical symptoms or fears associated with personal or school problems[.]

Hearing Decision at 7-8, ¶ 14; Record at 506.  The PET found that J.C. had a general pervasive mood of unhappiness or depression.  *Id.*[16]  It then evaluated whether this behavior had been demonstrated over a long period of time or was displayed to a marked degree in school.  *Id.*  It answered the first question in the positive and the second in the negative.  *Id.*  It did not feel that J.C.'s behaviors in the school setting adversely affected her educational performance, as she was attentive in class and earned good grades and scores on standardized tests.  *Id.*  Accordingly, the

---

[16] The Hearing Officer mistakenly stated that the PET found that J.C. had a general pervasive mood of unhappiness *and* depression.

PET found her ineligible under the category of emotional disability.  Hearing Decision at 8, ¶ 14; Record at 507.  The Parents signed a space on the form indicating agreement with the decision, Record at 507, although E.P. testified that she did so because she was misinformed that a student who was doing well academically could not qualify, and R.C. explained that he signed merely to indicate his presence at the meeting, *E.P.* at 164; *R.C.* at 468-69.

34.     While the PET found J.C. ineligible for special education, York staff members agreed that she should have a "504 plan."  Hearing Decision at 8, ¶ 14; *R.C.* at 465-68.[17]  R.C., along with school special-education staff, remained after the PET meeting ended and developed a list of accommodations for J.C., which was revised in an August 2006 meeting between J.C., E.P., and Sue Randolph, York's 504 liaison.  Hearing Decision at 8, ¶ 14; *R.C.* at 465-69; *E.P.* at 173-75.

35.     J.C. ended her sophomore year earning As, Bs, and a C+ in biology.  Hearing Decision at 8, ¶ 14; Record at 522.  She was not cited for breaking any school rules during her sophomore year at York High School.  Hearing Decision at 8, ¶ 14; *Macri* at 643.  She got along fine with teachers and peers.  *Wyatt* at 687-89; *Daley* at 720-22, 725-27; *Macri* at 643.  She was invited to rejoin LRP when she returned to York High School in March 2006, but she declined.  Hearing Decision at 7, ¶ 13; *E.P.* at 159.  She attended the Options program at the Cottage Program for teens with substance abuse problems and successfully completed it in April 2006.  *Id.*; Record at 297.  Warren, the substance abuse counselor, recommended that she continue with substance abuse counseling.  *Id.*

---

[17] This is a reference to accommodations offered pursuant to section 504 of the federal Rehabilitation Act, 29 U.S.C. § 794.  *See, e.g., Mr. and Mrs. I v.  Maine Sch. Admin. Dist. 55*, 416 F. Supp.2d 147, 152 (D. Me. 2006), aff'd, 480 F.3d 1 (1st Cir. 2007).

36.      J.C. later wrote that upon her return to York High School, "I immediately dove into drugs.  I was high all the time, morning, noon, and night.  My good grades were deceiving. The trivial ways of York High allowed me to do nothing and still succeed."  Record at 277.

37.      During the summer after 10th grade, J.C. later wrote, her life was "spinning out of control[,]" although she thought that she was happy because she was always under the influence and "drank relentlessly."  *Id*. at 277-78.  She took a job at a restaurant, but was fired after she drank a half bottle of champagne at the end of a shift and could barely stand up.  *E.P.* at 168-70. She began skipping her counseling appointments with Warren and became increasingly defiant at home.  *Id*. at 170-72, 179.  One night, when her father was away, J.C. threw a party at his house. *R.C.* at 470.  When R.C. confronted her, she frightened him when, in a rage, she impaled steak knives into the kitchen breadboard while informing him in no uncertain terms how much she hated him.  *Id*. at 470-71.  She shoplifted again in August 2006, and expressed no remorse. Record at  294; *E.P.* at 170-71.

38.      J.C. was glad to return to school in the fall to start her junior year (2006-07). Hearing Decision at 8, ¶ 15; Record at 278.  She was happy to be home, and she did not drink during September.  *Id*.  She got back with an old boyfriend and wanted to redeem herself with him.  Record at 278.  She did not drink again until October 2006, and then only on weekends. *Id*.  In addition to her boyfriend, with whom she "shared mutual love[,]" she had a "small group of good friends" whom she felt she could trust.  *Id*. at 279.  During the first quarter, her grades were very good: she earned As in all subjects except marine science, in which she earned a B+, and geometry, in which she earned a C+.  Hearing Decision at 8, ¶ 15; Record at 522.  She thought that her depression was under control, and that things were better.  Hearing Decision at 8, ¶ 15; Record at 278-79.  Her parents, however, disagreed.  Hearing Decision at 8, ¶ 15; *E.P.* at

175-76.  In their view, she continued to be edgy and sarcastic with them and to resist their attempts to impose limitations upon her.  *E.P.* at 175-76.

39.     Following J.C.'s job loss in August 2006, her mother began planning a substance abuse intervention for her with substance abuse counselor Warren.  *E.P.* at 435-36; Record at 368-72.  Early in J.C.'s junior year, E.P. and J.C. participated in a Youth Alternatives mediation program.  Hearing Decision at 8-9, ¶ 15; *E.P.* at 180-81.  In the second session, the mediator advised E.P. that E.P. could not control J.C. and, as a result, J.C. was in control of her own safety.  *E.P.* at 181.  This advice was a wake-up call for E.P., causing her to feel that immediate intervention was necessary.  *Id.*  The Parents promptly began to explore alternatives for educating J.C. elsewhere, including the Hyde School, a private school in Bath, Maine.  *Id.* at 182-83; Record at 359, 363.

40.     On September 27, 2006, J.C. and her parents traveled to the Hyde School for an interview.  Hearing Decision at 9, ¶ 16; Record at 359; *E.P.* at 182.  Although J.C. walked out of the interview during the first half-hour when challenged about her attitude, the interviewer continued to discuss options with the Parents.  *E.P.* at 182-83.  She recommended that they look into wilderness intervention programs.  *Id.* at 183.

41.     On October 2, 2006, the Parents met with Randolph and Alalia Thaler, a guidance counselor at York High School, to discuss J.C.'s 504 plan.  Hearing Decision at 9, ¶ 17; *E.P.* at 183-84.  When they notified Thaler of their intent to send J.C. to a wilderness intervention program, she commented, "[Y]ou're trying to save your daughter[']s life, aren't you[?]"  *E.P.* at 185.   On November 9, 2006, the Parents provided York with notice that they would be sending J.C. to New Horizons for Young Women ("NHYW").  Record at 456.  The District agreed to

place J.C. on temporary leave to facilitate her attendance at NHYW.  Hearing Decision at 9,
¶ 18; Record at 486.

42.    On November 14, 2006, the Parents and others conducted an intervention in
which they expressed to J.C. their concerns about her, and Warren informed her that she would
be going to NHYW.  *E.P.* at 187-89.  J.C. left willingly.  *Id.* at 189.  However, her mother
reported that J.C. was "shocked" and "blindsided" by the intervention, and J.C. herself later
reported that she was "blindsided" and had not expected to be sent away again.  *Id.* at 188;
Record at 279.  NHYW, in Orrington, Maine, is licensed as an outdoor camp and an outpatient
mental health program.   Hearing Decision at 9, ¶ 18; Testimony of Eilean Mackenzie
("*Mackenzie*") at 45; Record at 282.[18]  Participants, each of whom has a treatment plan, learn
how to manage challenging situations in the wilderness.  Hearing Decision at 9, ¶ 18; *Mackenzie*
at 44-47.  The usual stay at NHYW is six to nine weeks, but J.C. remained there for about 12
weeks while the family was trying to locate a longer term residential program for her to attend.
*Mackenzie* at 44; *E.P.* at 204; Record at 434.

43.    York teachers and staff with whom J.C. had contact during her junior year, prior
to her departure from York, again generally described her during that time frame as appearing
bubbly and upbeat and being a good class participant.   *Daley* at 726 (J.C. had a "great
personality" and was "bubbly and upbeat"); Testimony of Elizabeth Bacon ("*Bacon*")[19] at 705-
06 (J.C. was good student, good participant, very capable, very lively, not depressed, had
excellent communication skills), Testimony of Jean Lynch Beetz ("*Beetz*").[20]  J.C.'s 11th grade
French teacher, Nancy Somerset Stevens, testified that at times J.C. seemed sleepy during that
first-period class and at times she was reluctant to participate in small group discussions and

---

[18] Mackenzie was NHYW's clinical director.  *Mackenzie* at 43.
[19] Bacon taught J.C. science in the 11th grade at York High School.  *Bacon* at 702-04.
[20] Beetz was the District's director of special education.  *Beetz* at 614.

activities, but she did so well in the class that Stevens nominated for the *Société Honoraire de Français*, a world languages national honor society.   Testimony of Nancy Somerset Stevens ("*Stevens*") at 590; Record at 522.

44.      After J.C.'s arrival at NHYW on November 15, 2006, Pam Braley, LCSW, conducted a comprehensive mental health evaluation.   Hearing Decision at 9, ¶ 19; Record at 282-91.[21]   J.C. described her strengths as academics and love of languages and history and being friendly and outgoing; she was noted to be attractive and engaging.   Hearing Decision at 9, ¶ 19; Record at 290.   She described her weaknesses as ADHD, depression, having a bad temper, lethargy, lack of motivation, becoming easily frustrated, and having a negative attitude much of the time.   *Id*.   She added, "I guess my drinking is also a weakness."   *Id*.   Her Axis I diagnoses were "substance abuse, alcohol, and pot," and depression, NOS [not otherwise specified]. Hearing Decision at 9, ¶ 19; Record at 291.   Her Axis IV diagnoses were "severe stress, peer relationship problems, depression, family conflict, very low self-esteem[.]"   *Id*.

45.      J.C. remained at NHYW for three months, during which time she wrote "truth letters" confessing her feelings and behaviors to her parents.   Hearing Decision at 10, ¶ 20; Record at 263-66, 270A-81; *E.P.* at 191.   The clinical director at NHYW testified that, as J.C. started to talk about her behavior, she would spiral into a sense of shame and guilt and, in turn, try to control everything around her.   *Mackenzie* at 62.   When J.C. felt that she was not in control, she would become even more frustrated, depressed and angry.   *Id*.   When J.C. heard from her parents that her stay at NHYW was being extended to permit them to find a residential placement for her, and she was not going to go home, she regressed, engaging in such behaviors as screaming, shouting, swearing, pounding on the floor, kicking things around the office, and, on one occasion, grabbing a pair of scissors from her therapist's desk and threatening to kill

---

[21] The Hearing Officer mistakenly stated that J.C. had arrived on November 15, 2007.

herself.  *Id.* at 62-65; Record at 260.  Despite this, J.C. began to learn coping skills and anger

management strategies.  *Mackenzie* at 63.  Although she made considerable progress, her

counselors considered her to be still in the early stages of recovery.  Hearing Decision at 10,

¶ 20; *Mackenzie* at 62-63.

       46.     In a discharge summary dated January 4, 2007, Braley stated:

> [J.C.] is capable of making an excellent presentation.  Underneath this false
> presentation is a child who suffers with low self-esteem, lack of confidence and
> spiraling issues of shame due to her behaviors and failures.  In school she presents
> a facade of [a] capable and confident student but feels very inadequate and highly
> threatened by fear of failure. . . .  She constantly copes with severe mood swings.
> Her academic success comes at a high price and has a compulsive nature to it.
> This teen is at high risk for further behavioral, mental health and substance abuse
> problems.  [J.C.'s] complex array of behavioral and psychological difficulties
> require a structured, contained setting with firm limits and 24 hour supervision[.]
> In a residential, educational program with a strongly integrated clinical
> component [J.C.] will have the the [sic] greatest chance of working through the
> significant issues that compromise her daily functioning and be able to achieve
> her social, emotional and educational potential.  The NHYW team strongly
> recommends a residential placement to contain [J.C.], maintain her safety and
> allow her to internalize healthy positive strategies to deal with her
> psychological/behavioral difficulties.

Hearing Decision at 10, ¶ 20; Record at 228.  The discharge summary assessed J.C. with ADHD,

major depression, unspecified, rule out bipolar disorder, and polysubstance dependence.  Record

at 228.  Braley also noted J.C.'s significant family conflict, negative peer network, and high-risk,

out-of-control behaviors.  *Id.*

       47.     On December 20, 2006, the Parents made a new special-education referral to the

PET, which met on January 4, 2007.  Hearing Decision at 10, ¶ 21; Record at 469-70, 483.

Braley's discharge summary was forwarded to the PET.  Hearing Decision at 10, ¶ 21; Record at

472-79.  At the January 4, 2007, meeting, the PET discussed J.C.'s presentation in the classroom.

Hearing Decision at 10, ¶ 21; Record at 462.  J.C.'s teachers all liked her very much and agreed

that she always did quality work and that they had no problems with her at school.  *Id.*  The PET

did not find J.C. eligible for special education under the emotional disability category, noting that she did not display behaviors of emotional disability in school pervasively and did not suffer "adverse educational effect."   Hearing Decision at 10, ¶ 21; Record at 470.   In making that determination, the District used the same eligibility checklist that it had used at the May 19, 2006, PET meeting.  Hearing Decision at 10, ¶ 21; Record at 469-70.  The Parents indicated their disagreement with that decision.  *Id.*  York subsequently offered to have Kerry Hoag, Psy.D., perform a new psychological assessment of J.C., and the Parents consented to the suggested evaluation.  Record at 430, 440-41.

48.     The Parents began looking at residential therapeutic placements for J.C.  Hearing Decision at 11, ¶ 22; *E.P.* at 197-98.  By letter dated January 24, 2007, they notified the District that they would be removing J.C. from District schools and placing her in a residential therapeutic facility.   Hearing Decision at 11, ¶ 22; Record at 434-35.   They again expressed disagreement with the District's ineligibility determination, and informed the District that they would seek reimbursement of the costs associated with J.C.'s unilateral placement.  *Id.*

49.     On February 1, 2007, Diane Tennies, Ph.D., performed a psychological evaluation of J.C.  Hearing Decision at 11, ¶ 23; Record at 246.  She did so at the request of NHYW. Record at 296.  Dr. Tennies has performed about 100 evaluations for young women at NHYW in the past five years.  Testimony of Diane Tennies ("*Tennies*") at 787.  She conducted a clinical interview with J.C., performed a mental status assessment of her, reviewed records, and interviewed her parents by telephone.  Record at 246.  J.C. reported to Dr. Tennies that she felt neglected and unloved because she had been at NHYW for so long, that she felt her placement there had been a punishment, and that being there was making her depressed.  Id. at 247; *Tennies* at 802.

50.     Dr. Tennies diagnosed J.C. with Major Depressive Disorder, Polysubstance Dependence, and Attention Deficit Disorder.  Hearing Decision at 11, ¶ 23; Record at 249.  J.C. did not present with anxiety symptoms, and was not diagnosed with an anxiety disorder. Hearing Decision at 11, ¶ 23; Record at 246, 249.  Dr. Tennies expressed the opinion that J.C.'s depressive disorder existed prior to her history of substance abuse, noting her "dramatic mood swings [without] alcohol [and] drugs." Record at 202-03.  Dr. Tennies agreed with Braley's recommendation of a contained residential placement to solidify J.C.'s treatment gains, based upon her difficulties with mood management, impulsivity, irritability, and containing her emotional outbursts, and her previous psychiatric hospitalization.  Hearing Decision at 11, ¶ 23; Record at 249.  In her testimony, Dr. Tennies admitted that placement in an "emotional growth boarding school" is a fairly common recommendation as a followup for young women at NHYW.  *Tennies* at 795.

51.     On February 8, 2007, while J.C. was still at NHYW, Dr. Hoag performed a psychological evaluation of her at the District's request.  Hearing Decision at 11, ¶ 24; Record at 405.  The evaluation included normed, formal assessments, completed with input from six of J.C.'s teachers as well as J.C., a record review, and interviews with J.C. and her social worker at NHYW.   Record at 406.   Dr. Hoag noted that J.C. presented well and that her engaging personality easily could be misinterpreted to indicate that she was happy and well-adjusted. Hearing Decision at 11, ¶ 24; Record at 406.  Her testing indicated that J.C. was struggling with a dual diagnosis of substance abuse and depression, with evidence of Dysthymia as well as Major Depression.  Hearing Decision at 11, ¶ 24; Record at 410.  J.C. also obtained a clinically significant score on borderline tendencies, indicating that she might be developing Axis II traits of a personality disorder.  Hearing Decision at 11, ¶ 24; Record at 407.  Results of MACI testing

indicated that J.C. was "experiencing significant clinical distress[.]"  Record at 407.  She also "scored well above the clinically significant cut off in the areas of substance abuse proneness and depression."  *Id.*

52.     Dr. Hoag obtained completed BASC questionnaires from six of J.C.'s teachers and from J.C.  Hearing Decision at 11, ¶ 24; Record at 408-09.  The responses of one teacher placed J.C. in the clinically significant range for withdrawal and at risk for hyperactivity and atypicality.  Record at 409.  Two of J.C.'s teachers rated her in the clinically significant range for lack of social skills and at risk for lack of leadership skills.  *Id.*  J.C's self-ratings on the BASC produced clinically significant scores for lack of self esteem and placed her at risk for sensation-seeking behaviors, social stress, and depression.  *Id.*  Dr. Hoag observed that it was "notable that [J.C.] does not present many behavioral or emotional concerns at school."  Hearing Decision at 11-12, ¶ 24; Record at 410.  Dr. Hoag concluded that J.C.'s good grades demonstrated her ability to benefit from her education, despite experiencing significant emotional turmoil.  *Id.*  She noted that sports and academics were areas about which J.C. could feel good, which was different than how she felt most of the time.  *Id.*  Dr. Hoag also felt that J.C. suffered from two kinds of depression, and that her major depression stemmed from being removed from her family. Hearing Decision at 12, ¶ 24; Testimony of Kerry Hoag ("*Hoag*") at 536-37.  For this reason, she did not recommend a residential placement for J.C.  *Hoag* at 568-69.

53.     Dr. Hoag testified that she believed that J.C.'s ongoing, low-grade depression likely resulted from guilt or shame that she felt over her behaviors.  *Hoag* at 536.  She concluded that, on occasion, J.C. would experience more marked, short-term depression in response to incidents of significant emotional distress, such as when she was placed at Spring Harbor and at NHYW.  *Id.* at 536-37.  Dr. Hoag testified that she "absolutely disagrees" that J.C.'s substance

abuse is a form of self-medication for her depression. *Id*. at 539. Instead, she believes that it represents a self-destructive behavior that arises out of J.C.'s personality traits. *Id*. She testified that she did not believe that J.C. requires any kind of specialized education in order to perform well in any area of school. *Id*. at 549.

54.     On February 6, 2007, the Parents settled on placing J.C. at the King George School ("KGS") in Sutton, Vermont, and submitted her application. Record at 229-45. They chose KGS, an "emotional growth" boarding school, because it offered a strong academic program, a focus on the arts, and a secure, supportive environment. Hearing Decision at 13, ¶ 26; *E.P.* at 199; Testimony of Mark Evan Tucker ("*Tucker*") at 212.[22]     As of the time of hearing, KGS had a coeducational population of 38 students, most of whom were there for emotional reasons. Hearing Decision at 13, ¶ 26; *Tucker* at 218, 220. KGS teaches students self-regulation, self-sufficiency, and self-esteem. Hearing Decision at 13, ¶ 26; *Tucker* at 213. Students progress through different phases and are usually there for 12 to 15 months. Hearing Decision at 13, ¶ 26; *Tucker* at 238.

55.     KGS's emotional growth component includes rewards-based "phase work," individualized to meet the functional needs of each student; therapeutic in-the-moment coaching; and an arts education program that supplements the therapeutic programming. *Tucker* at 228-30, 239-47. The school offers a standard academic curriculum, which runs through most of each school day. Record at 219. Students participate in KGS's separate "emotional growth" phases curricula for about an hour and a half each day, and somewhat longer in the summer. *Tucker* at 279.     KGS is approved as an independent school in Vermont but not as a special-education school or program. *Id*. at 260. No staff member who delivers the emotional growth curriculum has any mental health degrees or certification. *Id*. at 281-82; Testimony of Erin Sarah Sheldon

---

[22] Tucker was KGS's associate academic dean. *Tucker* at 208-09.

Kingsbury ("*Kingsbury*")[23] at 336-37; Testimony of Joshua Greeley Carpenter ("*Carpenter*")[24] at 374-75.  There are no scientific or longitudinal studies assessing the success of emotional growth educational programs at KGS.  *Tucker* at 259; *Carpenter* at 379.

56.     J.C. left NHYW on February 13, 2007, and arrived at KGS on February 14, 2007.  Hearing Decision at 13, ¶ 26; *E.P.* at 391-94.

57.     The PET met again in York on February 15, 2007, to consider J.C.'s eligibility for special education.   Hearing Decision at 13, ¶ 27; Record at 397.   The Parents attended by conference call, as they were snowed in while in Vermont.  *Id*.  Dr. Hoag discussed the results of her evaluation, and several of J.C.'s teachers discussed their experience with her.   Hearing Decision at 13, ¶ 27; Record at 397-400.  Dr. Hoag described J.C. to the PET as "present[ing] better and more emotionally stable than her testing shows[,]" having "depression and dysthymia as well as substance abuse[,]" having "low self-esteem in contrast to her presentation[,]" and "experiencing a great deal of anxiety."  Record at 399.  She noted, however, that J.C. "reported that she feels good about herself in school and in sports[,]" and "[t]esting indicated that school is an area that she feels good about herself."  *Id*.  Dr. Hoag told the PET that testing indicated that the answer to the question of whether there was a general, pervasive mood of unhappiness or depression was yes, "but the question is does it adversely affect educational performance."  *Id*. at 401.  This time, the team determined that J.C. did not display any of the five characteristics listed in the emotional disability form, and found her ineligible under the emotional disability category on that basis.  Hearing Decision at 13, ¶ 27; Record at 401.  The PET also determined that J.C. was not eligible as a student with a learning disability or other health impairment.  *Id*.  The Parents again expressed their disagreement with the ineligibility determination.  *E.P.* at 397-98.

---

[23] Kingsbury was J.C.'s primary therapist at KGS.  *Kingsbury* at 291.
[24] Dr. Carpenter was KGS's clinical director.  *Carpenter* at 344.

58.     At KGS, J.C. had a therapist, attended both individual and group therapy sessions, and made progress.  Hearing Decision at 13, ¶ 28; *Kingsbury* at 295, 302.  She also attended Alcoholics Anonymous and Narcotics Anonymous meetings regularly and had no access to alcohol or drugs.  Hearing Decision at 13, ¶ 28; *Kingsbury* at 306.

59.     During the spring of 2007, J.C. took the following courses and earned the following grades: algebra IIA, B; art history, A; diseases and history, A-; photography I, B+; studio art, A, and U.S. history, A+.  Hearing Decision at 14, ¶ 29; Record at 81.  All of her teachers commended her for her work.  *Id.*

60.     Since enrolling at KGS, J.C. has had occasional issues with personal displays of affection with boys at the school.  *Kingsbury* at 329-30.  Yet, J.C. made excellent progress at KGS, developing the ability to label her emotions, identify the root of those feelings, and demonstrate in functional ways a new repertoire of healthy coping skills, such as talking and writing.  *E.P.* at 399; *Kingsbury* at 307; Fitzhugh Dep. at 16-18.  She demonstrated a newfound ability to advocate for herself, rather than simply exploding emotionally in the face of authority and limit-setting, and developed self esteem unrelated to her physical appearance.  Fitzhugh Dep. at 10, 18, 24, 26; E.P. Dep. at 5-6.  She developed healthy relationships with male peers that were not based on her sexuality.  *E.P.* at 401-02.  At her deposition on February 22, 2008, Dr. Fitzhugh said that J.C. was doing as well at that time as the average 18-year-old girl in terms of seeing herself as an autonomous person "whose self image doesn't depend on relationships with guys[.]"  Fitzhugh Dep. at 51-52.

61.     J.C. was elected president of the student council at KGS in January 2008, having served on the council prior to that time.  *Id.* at 13, 43.  She was scheduled to complete the emotional growth phase system curriculum at KGS and to graduate with a high school diploma

on April 26, 2008. *Id*. at 30-31. She was planning to attend college in the fall, to the amazement of her parents and KGS staff. *Id*. at 31; E.P. Dep. at 10-11.

62.     The Parents state that they incurred costs of $98,489.29 for tuition, room, and board at KGS from February 2007 through April 2008, and costs of $7,945.83 for transportation and related expenses through February 2008. Parents' Brief at 21, ¶ 46.

63.     On April 17, 2007, the Parents filed a request with the MDOE for an administrative due process hearing. Record at 1-7. A hearing was conducted on June 4, 7, 12, and 20, 2007. Hearing Decision at 1. Fifteen witnesses testified. *Id*. The Parents submitted 439 pages of exhibits, and the District submitted 412 pages of exhibits. *Id*. at 2. The Parents argued that J.C. should have been found eligible as a student with an emotional disability given that (i) she had a condition exhibiting, over a long period of time and to a marked degree, either inappropriate types of behaviors or feelings under normal circumstances, or a general pervasive mood of unhappiness or depression, and (ii) her condition adversely affected her educational performance. *Id*. at 14, 16-17. They sought relief for the District's failure to identify their daughter as eligible for special education in the form of reimbursement of the costs of her KGS placement. *Id*. at 15. The District defended its decision of non-eligibility. *Id*.

64.     The Hearing Officer found in favor of the District. *Id*. at 23. She found that J.C. had been suffering from mild to moderate depression over a period of several years, that her problems were not related solely to substance abuse, and that "[i]n comparison with her peers, the student's emotionally disturbed behavior was more frequent and intense, and therefore, manifested itself to a marked degree." *Id*. at 17-18. She noted that because J.C. had depression, whether she also was socially maladjusted was irrelevant for purposes of eligibility analysis. *Id*. at 18-19. However, she concluded that J.C.'s condition had not adversely affected her

educational performance.  *Id*. at 19-22.  She found that J.C. did not demonstrate inappropriate behaviors under normal circumstances.  *Id*. at 22.  Finally, she discerned a separate barrier to J.C.'s eligibility: that the evidence did not support a conclusion that she needed special education and related services.  *Id*. at 22-23.  She concluded that because the District had not violated J.C.'s rights in deeming her ineligible for special education services, the District was not responsible for the costs of her unilateral placement at KGS.  *Id*. at 23.

65.    With respect to whether J.C.'s condition adversely affected her educational performance, the Hearing Officer reasoned:

> The parents assert that social, behavioral and emotional issues are as much a part of educational performance as academic issues.  It is certainly true that a student learns much more at school than what is taught in the academic curriculum.  Yet in *Gonz[á]lez* [*v. Puerto Rico Dep't of Educ.*, 254 F.3d 350 (1st Cir. 2001)], the First Circuit was clear that the IDEA need not address problems truly distinct from learning problems.  The student in the case at hand has not demonstrated a learning problem affecting educational performance.  She suffers from depression, which has led her to abuse drugs and alcohol, and engage in other undesirable behaviors outside of school.  These are mental health problems that have not damaged the student's ability to succeed in school.
>
> The parents point to the part of the *Mr. and Mrs. I* decision in which the Federal District Court recites portions of the Maine Learning Results regulations that list the many goals of the Learning Results program, including such things as explaining "the relationship between healthy behaviors and the prevention of injury," understanding, "how to reduce their health risks through the practice of healthy behaviors," demonstrating "ways to avoid or change situations that threaten personal safety," and "distinguish[ing] between healthy and unhealthy stress management techniques."  *Mr. and Mrs. I*, supra, at 12-13.  Understanding these things and actually putting them in to practice are two very different things.  For example, high school students smoke cigarettes and eat junk food at a proportionately higher rate than the rest of the population, but this does not mean they do not understand or have not learned how to reduce their health risks through the practice of healthy behaviors.  This is not a learning problem, but a failure to incorporate one's knowledge into one's daily life.  Cases cited above support a conclusion that Congress did not intend that the IDEA be interpreted so broadly that a failure to use healthy practices learned in school constitutes a failure to learn.

*Id*. at 21-22 (footnote omitted).

66.     With respect to whether J.C. needed special education and related services, the

Hearing Officer observed:

> There was no showing that the student needed specialized education to benefit
> from the curriculum.  As discussed above, the student was doing very well with
> the educational curriculum and related activities.  Her parents placed her at
> NHYW and KGS because they had difficulty preventing her from sneaking out of
> the house, using drugs and alcohol, and being sexually promiscuous.  The student
> undisputedly needs treatment for her depression and substance abuse problems.
> When the student was at Spring Harbor Hospital, and her depression was worse
> than it is currently, Dr. Broderick's recommendations were for psychological and
> substance abuse treatment.   Recommendations of other psychologists have
> focused on the student's need to address her depression and substance abuse, not
> on her education.  This falls squarely within the category of medical treatment,
> not educational services.

*Id*. at 22-23.

## II.  Proposed Conclusions of Law

1.     A party dissatisfied with the decision of an MDOE hearing officer may appeal

that decision to the Maine Superior Court or to the United States District Court.  20-A M.R.S.A.

§ 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

2.     The IDEA provides that a court reviewing the decision of a hearing officer "(i)

shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at

the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall

grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

3.     "The role of the district court is to render bounded, independent decisions –

bounded by the administrative record and additional evidence, and independent by virtue of

being based on a preponderance of the evidence before the court."  *Hampton Sch. Dist. v.
Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted).

"While the court must recognize the expertise of an administrative agency, as well as that of

school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court." *Id.* (citations and internal quotation marks omitted).

4.      The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise. *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP [individualized education plan] provides the hope of educational benefit.").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).

5.      In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief. *See, e.g., Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 51 (2005); *Dobrowolski*, 976 F.2d at 54; *Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R*., 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003)

("The party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

### A.  Definitions: "Child With a Disability"

6.    The IDEA defines a "child with a disability," in relevant part, as a child "(i) with . . . serious emotional disturbance (referred to in this chapter as 'emotional disturbance') . . . (ii) who, by reason thereof, needs special education and related services."   20 U.S.C. § 1401(3)(A).

7.    "Emotional disturbance" is defined, in relevant part, as:

(i)    . . . a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A)    An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>
> (B)    An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>
> (C)    Inappropriate types of behavior or feelings under normal circumstances.
>
> (D)    A general pervasive mood of unhappiness or depression.
>
> (E)    A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii)    Emotional disturbance includes schizophrenia.  The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.

34 C.F.R. § 300.8(c)(4).[25]

---

[25] Federal regulations defining "child with a disability" were amended both during and subsequent to the period the Parents describe as the relevant period in this case, from May 2006 through February 2007.  *See* Parents' Brief at 24 n.2.  However, there was no material change in the definition of "emotional disturbance."  *Compare* 34 C.F.R. § 300.8(c)(4) (eff. Oct. 30, 2007) *with* 34 C.F.R. § 300.8(c)(4) (eff. Oct. 13, 2006, to Oct. 29, 2007); 34 C.F.R. § 300.7(c)(4) (eff. to Oct. 12, 2006).  Hence, I quote from the regulation currently in effect.

8.      In like vein, at relevant times, Maine defined a "student with a disability" as an individual who, *inter alia*, has one or more listed disabilities (which include emotional disability) and who "[h]as been evaluated according to these rules and has been determined to have a disability which requires the provision of special education and supportive services."  Maine Special Education Regulations, Code Me. R. 05-071 ch. 101 (2003) ("MSER"), §§ 3.1, 3.5.[26] The MSER also defined "emotional disability" in a manner virtually identical to that of relevant federal regulations.  *Compare* 34 C.F.R. § 300.8(c)(4) *with* MSER § 3.5.

9.      Neither the IDEA nor accompanying federal regulations defines the phrase "adversely affects educational performance," thereby "leaving it to each State to give substance to these terms."  *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000).

10.      The MSER did not define the terms "adversely affects" or "adverse effect."  *See* MSER § 2.  However, this court has "interpret[ed] the phrase as reflecting Congress's and Maine's intent that any adverse effect on educational performance, however slight, meets this prong of the definition."  *Mr. and Mrs. I*, 416 F. Supp.2d at 160.

11.      The MSER did define "educational performance," as follows: "The term 'educational performance' includes academic areas (reading, math, communication, etc.), non-academic areas (daily life activities, mobility, etc.), extracurricular activities, progress in meeting goals established for the general curriculum, and performance on State-wide and local assessments."  MSER § 2.7.  In turn, the term "general curriculum" was defined to mean "the school administrative unit's local curriculum for grades K-12 which incorporate[s] the content standards and performance indicators of the Learning Results."  *Id*. § 2.11.  The Learning Results were defined, at relevant times, as "a comprehensive, statewide system of learning results" based

---

[26] Subsequent to the relevant time period, the MSER was superseded by a new set of special-education regulations, the Maine Unified Special Education Regulation, Birth to Age Twenty, Code Me. R. 05-071 ch. 101 (final adoption eff. May 15, 2008) ("MUSER").

broadly upon six "guiding principles" and aimed at establishing "high academic standards at all grade levels in the [eight content] areas of math; English; science and technology; social studies, including history, economics and civics; career preparation; visual and performing arts; health and physical education; and foreign languages."  20-A M.R.S.A. § 6209 (eff. May 30, 2006, through June 8, 2007).

12.     The IDEA defines "special education" as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including . . . (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education."  20 U.S.C. § 1401(29).  "Related services" are defined as "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services . . ., counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children."  *Id.* § 1401(26).

13.     If a child is determined to have an enumerated condition "but only needs a related service and not special education," the child is not eligible under the IDEA unless, consistent with 34 C.F.R. § 300.39(a)(2), "the related service required by the child is considered special education rather than a related service under State standards[.]"  34 C.F.R. § 300.8(a)(2).[27]

---

[27] Section 300.39(a)(2) provides that special education includes speech-language pathology services, or any other related service, if considered special education rather than a related service under state standards, travel training, and vocational education.  34 C.F.R. § 300.39(a)(2)

14.     Effective May 30, 2006, the Maine legislature defined "special education" and

"related services" as follows:

> **4-B.   Related   services.**     "Related   services"   means   special   education
> transportation and such developmental, corrective and other related services, as
> defined by the commissioner, as are required to assist children with disabilities to
> benefit from their special education programs.
>
> **5.     Special education.**   "Special education" means specially designed
> instruction, at no cost to parents, to meet the unique needs of children with
> disabilities, as defined by the commissioner, including:
>
> > **A.**     Instruction conducted in the classroom, in the home, in hospitals
> > and institutions and in other settings; and
> >
> > **B.**     Instruction in physical education.

20-A M.R.S.A. § 7001(4-B) & (5) & Historical & Statutory Notes thereto.[28]

15.     The MSER defined "special education services" and "supportive services" as

follows:

> 2.23   Special Education Services
>
> "Special education services" are educational services specially designed to
> meet the unique needs of a student with a disability provided at no cost to
> the parent by qualified individuals as defined by the commissioner.  All
> special education services shall be provided by qualified individuals
> employed or contracted by a school administrative unit, a private special
> purpose school, or a private general purpose school approved to provide
> special education and supportive services.
>
> > \*\*\*
>
> 2.28   Supportive Services
>
> "Supportive Services" means special education transportation, and such
> developmental, corrective, and other supportive services as are required to
> assist a student with a disability to benefit from his/her special education
> program.   The term includes, but is not limited to, speech-language

---

[28] While the Maine and federal definitions of "special education" now are virtually identical, Maine previously defined the term more inclusively, to wit: "classroom, home, hospital, institutional or other instruction; educational diagnosis and evaluation; transportation and other supportive assistance, services, activities or programs" required by students with disabilities. *Mr. and Mrs. I*, 416 F. Supp.2d at 166 (quoting former 20-A M.R.S.A. § 7001(5)).

> pathology, audiology, counseling services including rehabilitation
> counseling, orientation and mobility services, psychological services,
> physical therapy, occupational therapy, recreation including therapeutic
> recreation, early identification and assessment of students with disabilities,
> and medical services except that such medical services shall be for
> diagnostic or evaluation purposes only.  The term also includes school
> health services, social work services in schools, and parent counseling and
> training.  All supportive services shall be provided by appropriately
> certified or licensed professionals or appropriately supervised support
> staff.  The term "Supportive Services" is synonymous with the term
> "Related Services" as used in the 1997 Amendments to the Individuals
> with Disabilities Education Act.

MSER §§ 2.23, 2.28.  The MSER contained an exclusion for medical services or treatment,

providing: "Services or treatment performed by psychiatrists, physicians, optometrists,

chiropractors, registered substance abuse counselors, or other medical personnel are not an

allowable special education or supportive service."  *Id.* § 6.2(A).

16.    Schools that receive federal funding are required to identify, locate, and evaluate

students who are in need of special education and related services.  *See, e.g.,* 20 U.S.C.

§ 1412(a)(3)(A); MSER § 7 (describing Maine schools' "child find" obligations).  Schools must

provide such students with a free appropriate public education, or "FAPE," via an individualized

education program, or "IEP," that is "reasonably calculated to enable the child to receive

educational benefits[.]"  20 U.S.C. § 1412(a)(1) & (4); *Board of Educ. v. Rowley*, 458 U.S. 176,

207 (1982).

### B.  Parties' Arguments

17.    The Parents contend that the Hearing Officer erred in upholding the District's

determination that J.C. was ineligible for special education pursuant to the IDEA and relevant

Maine state law.  *See* Parents' Brief at 24-41.  They reason that:

A.    "The hearing officer in this case correctly found, based on the overwhelming

weight of the evidence, that J.C. has a general pervasive mood of depression, that this depression

36

has existed over a long period of time to a 'marked degree,' and that she is not merely socially maladjusted." *Id*. at 25.

      B.     The Hearing Officer erroneously found that J.C.'s condition did not satisfy subcategory C of the emotional disability category, "inappropriate types of behavior or feelings under normal circumstances," but that finding is irrelevant because a child's condition need meet only one of the five subcategories, and she held that J.C.'s condition satisfied subcategory D, "a general pervasive mood of unhappiness or depression." *Id*. at n.3.

      C.     "As a result, the only issues regarding eligibility to be reviewed by the Court are whether J.C.'s disability adversely affects her educational performance and whether she needs special education and related services on account of her disability." *Id*. (footnote omitted).

      D.     The Hearing Officer erred in holding that a condition cannot adversely affect educational performance unless it adversely affects ability to learn (versus ability to practice what one learns). *See id*. at 26-32.  In fact, as Maine's latest iteration of its Learning Results reveals, Maine places a high premium on functional demonstration of knowledge. *See id*. at 28-30.  Thus, the court should "conclude that proof of an adverse effect on a student's performance of functional skills is sufficient to establish that a student's disability adversely affected her educational performance[.]" *Id*. at 32.

      E.     The evidence establishes that J.C. engaged in drinking, drugging, cutting herself, and promiscuity "because of her functional inability to utilize positive coping skills in the face of emotional stressors, even if her disability did not affect her intellectual ability to understand that her methods of coping were not healthy or to grasp that healthier alternatives existed." *Id*.  Her difficulties in developing and employing functional coping skills mean that "she has not effectively learned a number of skills that are part and parcel of Maine's general curriculum,

such as the ability to demonstrate strategies for reducing stress, to demonstrate healthy practices to improve her health, to demonstrate strategies to resolve interpersonal conflicts without harming herself, or to utilize skills for communicating effectively with others to improve her health." *Id*. at 34 (citing Learning Results: Parameters for Essential Instruction, Code Me. R. 05-071 ch. 132 (2007) ("Learning Results/Parameters").

      F.     "Once one recognizes that functional performance is an essential part of education and learning, then it is irrelevant whether a student's emotional or behavioral issues are witnessed in school or not." *Id*. at 35.

      G.     In any event, although J.C.'s teachers testified at her hearing that her depression did not affect her in class, there is written evidence to the contrary. *See id*. at 34-35 n.6. This includes behavior reports and teacher e-mails from the eighth grade describing depression, inappropriate behaviors, and defiance, as well Stevens' report that J.C. often fell asleep in French class in the 11th grade, was self-isolating, would refuse to participate in class activities, challenged the way the teacher did things, had erratic behavior, said startling things, and did not hand in all of her work. *See id*.

      H.     When one understands that "educational performance" includes functional performance, it is clear that the Hearing Officer erred in concluding that J.C. did not require special education and related services. *See id*. at 38. The only hope for J.C. to become an independent, functioning adult in society was to provide her with special education and related services she required to develop proper emotional management and coping skills, such as the services KGS provided. *See id*. at 38-40. These are not "medical" services, but rather a specialized emotional growth instructional program, separate and apart from the ongoing medical

and quasi-medical services of which J.C. availed herself both before and since enrolling at KGS, such as treatment with a psychiatrist and individual and group therapy. *See id*. at 40

18.     As a remedy for the District's asserted transgression in failing to deem J.C. eligible for special education, the Parents seek reimbursement of the costs of her unilateral placement at KGS. *See id*. at 41-48.[29]

19.     The District rejoins that:

A.     By relying only on their argument regarding subcategory D, "a general pervasive mood of unhappiness or depression," the Parents have abandoned in this appeal any claim that J.C. should have been found eligible under subcategory C, "inappropriate types of behavior or feelings under normal circumstances." District Brief at 25.

B.     The Hearing Officer did not make any explicit finding that J.C.'s depression was "pervasive," missing a key and distinct element of the eligibility standard. *See id*. at 26-27. In fact, the evidence demonstrates that J.C.'s depression was not pervasive in that it did not permeate all aspects of her life, most notably not having been observed in the school setting to any degree out of the ordinary. *See id*. at 27-28.

C.     The Hearing Officer erred in deeming J.C.'s depression "marked," given that J.C. suffered only from dysthymia, or low-grade depression, except for two relatively brief periods during her hospitalization at Spring Harbor and her stressful stay at NHYW. *See id*. at 28-29.

D.     However, the Hearing Officer correctly determined that J.C.'s condition did not adversely affect her educational performance. *See id*. at 29-42. There is no authority standing for the proposition that behaviors occurring and visible virtually exclusively outside of the

---

[29] The Parents also initially alternatively sought a remedy of "compensatory education" in the form of reimbursement of KGS costs. *See* Parents' Brief at 48-50. However, in their reply brief, they omitted mention of that request, seemingly in tacit recognition of the correctness of the District's position that reimbursement is not available as a form of compensatory education. *See* District Brief at 49-50; Plaintiffs' Reply Memorandum of Law ("Parents' Reply") (Docket No. 32); *Ms. M. ex rel. K.M. v. Portland Sch. Comm.*, 360 F.3d 267, 273 (1st Cir. 2004).

school context, such as J.C.'s drinking, drugging, cutting, and promiscuity, are grounds for a determination of IDEA eligibility; in fact, the authorities, including *González*, suggest the opposite. *See id*. at 33-42. The Record is clear that, but for disciplinary slips and rare emotional outbursts in middle school, which the Hearing Officer correctly concluded were not unusual for a teenager, J.C.'s performance was strong across all fields in school, including academics, behavior, school citizenship, and communication skills. *See id*. at 29-32, 39.

E.      In any event, the Hearing Officer correctly concluded that J.C. did not need special education. *See id*. at 42-44. "[E]ven if the Court were to find that there had been some minor adverse effect on educational performance caused by JC's depression, JC would nevertheless be ineligible because any such impact on her school performance was so slight that JC still did not need special education in order to benefit from school." *Id*. at 42. What is more, a need for counseling is not a need for special education but rather a need for a related service, which cannot support IDEA eligibility. *See id*. at 43-44.

F.      Although the court need not reach the issue, the Hearing Officer's conclusion may be upheld on the separate basis that the behaviors of concern were caused by social maladjustment, not by depression. *See id*. at 44-46.

G.      Should the court reach the reimbursement question, that requested remedy should be denied both because KGS was not an appropriate placement for J.C. and because the Parents did not provide proper notice of their intent to make a unilateral private placement for her. *See id*. at 46-49.

20.     The Parents respond, *inter alia*, that:

A.      The word "pervasive" in the emotional disability regulation modifies only "mood of unhappiness," not "depression." *See* Parents' Reply at 2-3 (arguing that regulation requires

showing of *either* a "general pervasive mood of unhappiness" *or* "depression"). Thus, there is no need to make a showing of "pervasive depression." *See id*. In any event, there is ample evidence that J.C.'s depression was pervasive. *See id*. at 3-4.

  B. The Hearing Officer correctly found that J.C.'s depression was "marked." *See id*. at 2-3 n.2.

  C. They have not waived or abandoned their alternative argument that J.C. is eligible because she exhibited "inappropriate types of behaviors or feelings under normal circumstances." *See id*. at 4. They preserved the issue by raising it in their complaint and arguing, in their brief, that they disagreed with the Hearing Officer's conclusion, although it was inconsequential to her ruling. *See id*. On the merits, the Hearing Officer erred in finding that J.C. had not demonstrated inappropriate behaviors under normal circumstances, and in making no ruling as to whether she had demonstrated inappropriate feelings. *See id*. at 5. J.C. demonstrated a number of inappropriate behaviors, such as cutting herself, stealing, sneaking out of her parents' home to engage in sex, and being drunk or high, even in school, as well as inappropriate feelings, including intense shame and self-hatred. *See id*. at 5-7.

### C. Analysis

  21. This is a difficult case, involving a highly intelligent but deeply troubled young woman who suffered serious adverse effects from her condition, but displayed virtually none in school, particularly York High School, where the PET decisions at issue were made. As such, this lawsuit tests the outer boundaries of IDEA eligibility. After a thorough review of the entire record, including the supplemental evidence that the Parents were permitted to file with this court, and after careful consideration of counsel's well-crafted briefs, I conclude that the Hearing Officer correctly perceived this case as falling without those boundaries.

22.     As a threshold matter, I agree with the District that the Hearing Officer erred in failing to make an explicit finding as to whether J.C.'s depression was pervasive.  The Parents offer good reason why, from a clinical and common-sense point of view, one should be required to demonstrate either a "general pervasive mood of unhappiness" or "depression."  *See* Parents' Reply at 2-3.  However, they offer no caselaw or regulatory authority for that proposition, *see id.*, and, on a plain reading, the text indicates that the word "pervasive" modifies the word "depression," requiring that a child's condition exhibit "[a] general pervasive mood of unhappiness or depression[,]" 34 C.F.R. § 300.8(c)(4)(i)(D), not "a general pervasive mood of unhappiness, or depression," or "depression, or a general pervasive mood of unhappiness."

23.     Nonetheless, the evidence amply supports a finding that J.C.'s depression was pervasive, that is, spreading throughout or permeating her life.  *See* Webster's II New Riverside Univ. Dictionary 878 (1994) (defining "pervade" as "[t]o be spread throughout: PERMEATE").  From May 2003, when Dr. Gear first assessed J.C. with "anxious depression," through February 2007, when Dr. Hoag performed a comprehensive psychological evaluation on behalf of the District, J.C. consistently has been assessed as suffering from depression or dysthymia.  Professionals assessing her did not suggest that she was episodically free of depression or dysthymia, but, rather, that she was capable of successfully masking her symptoms.  *See, e.g.*, Record at 406 (observation of Dr. Hoag that J.C. "presents well and her engaging personality could easily be misinterpreted that she is a happy, well adjusted adolescent without much emotional distress"), 573 (observation of Dr. Broderick that J.C. "typically deals with her feelings in a more intellectual manner, effectively masking at times the depth of her distress or dysphoric affect"); *E.P.* at 126-27 ("[O]ne thing that's been true about [J.C.] from early years is that she appears happy and cheerful and appears that she's handling things, but inside, she's you

know, a black hole."). J.C.'s own "truth letters" attest to the roiling, underlying emotions she felt even at school. *See* Record at 272-79. Even Dr. Hoag, the District's psychological expert, deemed J.C.'s depression pervasive. *See id*. at 401.[30]

24.     The question of whether J.C. exhibited depression to a marked degree is a closer one. By and large, J.C. did not exhibit her depression at school. As Dr. Hoag observed, she struggled with dysthymia, exhibiting signs of major depression only when under extreme stress, for example, following her removals to Spring Harbor and NHYW. Nonetheless, on the totality of the evidence, I agree with the Hearing Officer and the Parents that J.C. fairly can be described as having a condition exhibiting characteristics of unhappiness or depression to a marked degree. That evidence includes not only her documented incidents of major depression, but also her sometimes explosive interactions with her parents and her long-running history of risky, self-destructive behaviors, including cutting herself, drinking, drugging, and promiscuity, commencing as early as in the sixth grade. As the Hearing Officer observed: "In comparison with her peers, the student's emotionally disturbed behavior was more frequent and intense, and therefore, manifested itself to a marked degree." Hearing Decision at 18.[31]

25.     I turn to whether J.C.'s condition adversely affected her educational performance. The Parents bear the burden of persuasion that the decision they challenge was wrong. *See, e.g.*, *Mr. and Mrs. I.*, 416 F. Supp.2d at 156. They fail to carry that burden.

---

[30] The District states that Dr. Hoag testified that she did not believe that J.C.'s depression was pervasive. *See* District Brief at 28 (citing *Hoag* at 531). That is not a fair characterization of the cited passage. Dr. Hoag testified that she did not feel that J.C. met the criteria for borderline personality disorder because the personality traits in which she scored high were not pervasive. *See Hoag* at 531-32.

[31] I do not reach the Parents' alternative argument that their daughter had a condition exhibiting "inappropriate types of behavior or feelings under normal circumstances." *See* Parents' Brief at 25 n.3; Parents' Reply at 4-7. They preserved that issue only to the extent that J.C. was deemed not to have had a condition exhibiting "a general pervasive mood of unhappiness or depression." *See id*. I also do not reach the District's argument that J.C. suffered solely from social maladjustment. *See* District Brief at 44-46.

26.     The Parents assail the Hearing Officer's "erroneous distinction between a learning problem (i.e., the inability to understand something) and a failure to incorporate such knowledge into the manner in which one functions in daily life (i.e., the inability to utilize learned knowledge)," Parents' Brief at 27, emphasizing that both the IDEA and the latest iterations of Maine's Learning Results and its special education regulations make clear that "functional performance" is a key part of "educational performance," *see id*. at 27-30; *see also, e.g*., 20 U.S.C. § 1414(d)(1)(A)(i) (defining an IEP as "a written statement for each child with a disability that . . . includes . . . a statement of the child's present levels of academic achievement and functional performance"); MUSER §§ II.9 (defining "educational performance" as "performance in academic area (for example, written literacy skills, math, communication), functional areas of performance (how the child demonstrates his/her skills and behaviors in cognition, communication, motor, adaptive, social/emotional and sensory areas), and for a child age 3-5, age appropriate developmental activities across five domains of development (communication, physical, cognitive, self-help/adaptive, and social/emotional) in an educational setting"); II.13 (defining "functional performance" as "how the child demonstrates his/her skills and behaviors in cognition, communication, motor, adaptive, social/emotional and sensory areas").

27.     The Parents' reliance on the current versions of Maine's Learning Results and special education regulations (the MUSER) is misplaced: those versions were not in effect during the times the Parents themselves have identified as relevant in this case, and therefore can shed no light on how Maine then defined "educational performance."

28.     In any event, even assuming *arguendo* that it is appropriate to look to Maine's current regulations to divine Maine's definition of "educational performance" at the relevant

44

times, I am unpersuaded that Maine considers students' conduct, or misconduct, outside of the school milieu a part of their educational performance.

29.     The Parents point out that the current version of Maine's Learning Results requires students to demonstrate a number of functional behaviors by the time they graduate, including, in the content area of "Career and Education Development," "strategies to improve their personal traits and behaviors" and "successful strategies for accomplishing tasks, balancing career and life roles, and reducing stress in a variety of school, work, and community settings," and in the content area of "Health Education and Physical Education," "a variety of behaviors to avoid or reduce health risks to self and others," "skills for communicating effectively with family, peers, and others to enhance health," "effective communication skills including asking for and offering assistance to enhance the health of self and others," and "refusal, negotiation, and collaboration skills to enhance health and avoid and reduce health risks[.]" Parents' Brief at 29-30 (quoting Learning Results/Parameters at 7, 9, 38, 41-42).  They posit that, even if J.C. possessed the intellectual ability to understand such concepts and skills, she engaged in drinking, drugging, cutting herself, and promiscuity because of her functional inability to use those skills. *See id*. at 32.  Hence, they reason, she had not effectively learned a number of skills that are part and parcel of Maine's general curriculum, including the ability to demonstrate, *inter alia*, strategies for reducing stress and healthy practices to improve her health. *See id*. at 34.

30.     Nevertheless, none of the Learning Results or MUSER passages that the Parents cite makes clear that students are required to demonstrate the requisite skills and behaviors at home, or in any context outside of school, as part of their educational performance. *See* MUSER §§ II.9, II,13; Learning Results/Parameters at 6-7, 9, 38, 41-42.  For the Parents, the proposition is self-evident: the whole point of education is to teach skills that can be generalized outside of

the school context.  *See* Parents' Brief at 35 ("Just as no one would be impressed by a school that taught a child to read only at school, but not elsewhere, the test for eligibility is not simply whether a student can negotiate the school day – especially when expectations are substantially lowered in that setting to accommodate the student's disability – if she is destined to leave school without the skills necessary to becoming an independent, functioning adult in the community.").

31.    Yet there is material difference between requiring demonstration of skills and behaviors in school in the hope that they will be generalized to other contexts, *see, e.g., Mr. and Mrs. I*, 416 F. Supp.2d at 158 n.4 (describing Maine's aspirational guiding principles), and requiring demonstration of skills and behaviors outside of school as part of the educational curriculum itself.  As the District observes: "[T]here is nothing anywhere in these regulations [the Learning Results/Parameters sections cited by the Parents] that in any manner indicates that the standard for measurement should be how the child is acting after hours with his or her friends.  Such an Orwellian approach to 'demonstrating' knowledge or skills would draw the school and school officials out into the community, into the homes, and into the youth 'hang outs' of the community – at incredible expense and intrusiveness."  District Brief at 38 (footnote omitted); *see also, e.g*., Robert A. Garda, Jr., *Untangling Eligibility Requirements Under the Individuals with Disabilities Education Act*, 69 Mo. L. Rev. 441, 479 (2004) ("Garda") (noting that, while schools typically track behavior, "the poor behavior must occur in-school, as out-of-school behaviors such as those relating to parent/child relationships are typically not tracked by schools and not covered in the curriculum. . . .  The only exception [for purposes of assessing adverse effect on educational performance] should be when the out-of-school behavior affects an area of educational performance, such as completing homework or attending school.").

32.     Nor does caselaw touching on the question of in-school versus out-of-school conduct help the Parents.  In *González*, the First Circuit made clear that the IDEA does not address "social problems at home," as distinct from a "student's educational needs," although it acknowledged that, in some serious cases, as a practical matter, the two are intertwined:

> As a conceptual matter, the district court's recitation of the relevant legal standard was correct as to problems truly "distinct" from learning problems.  Educational benefit is indeed the touchstone in determining the extent of governmental obligations under the IDEA.  Thus we have said, for example, that the Act does not require a local school committee to support a handicapped child in a residential program simply to remedy a poor home setting or to make up for some other deficit not covered by the Act.  It is not the responsibility of local officials under the Act to finance foster care as such: other resources must be looked to.
>
> Nonetheless, as a practical matter, in cases such as this one, where all agree that the student's activities need to be highly structured both during and after school in order for him to receive an appropriate education, clear lines can rarely be drawn between the student's educational needs and his social problems at home.  Thus, typically an IEP in cases where the student's disability is this serious (and requires such a degree of structure) must address such problems in some fashion, even if they do not warrant residential placement.

*González*, 254 F.3d at 352-53 (citations and internal quotation marks omitted).  Other courts have reached similar conclusions.  *See, e.g., Escambia County Bd. of Educ. v. Benton*, 406 F. Supp.2d 1248, 1265 (S.D. Ala. 2005) ("[T]he IDEA is focused on provision of a FAPE to disabled children, and is not designed to ameliorate inappropriate behaviors beyond the school environment.").

33.     *Mr. and Mrs. I* does not indicate otherwise.  Judge Hornby focused on the multiple ways in which Asperger's Syndrome, the impairment suffered by the student in question, had affected her in school and, in keeping with *González*, found that the school district and the Hearing Officer had erred in determining that she was ineligible for special education.  *See Mr. and Mrs. I*, 416 F. Supp.2d at 161 ("The problems [the student] *experienced at school* as a result of Asperger's Syndrome occurred in areas that Maine considers 'educational

performance,' including academic areas, non-academic areas, and progress toward Maine's general curriculum standards.") (emphasis added), 162 n.8 ("There is also the fact of [the student's] self-mutilation (carving into her own arms) during long breaks from math class in sixth grade, surely demonstrating a failure to understand the relationship between healthy behaviors and injury prevention, how to avoid or change situations that threaten personal safety, or distinguish between healthy and unhealthy stress management techniques or how to learn responsible personal and social behaviors.  These are all skills that Maine requires students to acquire and *demonstrate in school*.") (citation omitted) (emphasis added).

34.     The Parents cite *Parent v. Gorham Sch. Dep't*, Case No. 07.020H, at 12-13 (Me. Dep't of Educ. Jan. 5, 2007), for the proposition that "[s]chools may not wash their hands of students solely because they do not present their behavioral or emotional issues in school if they are falling apart outside of school."  Parents' Brief at 35.  However, *Gorham* was not an eligibility case.  The student had already been found eligible; the question presented was whether his IEP adequately addressed the full scope of his needs, including behaviors at home that were linked to events and experiences at school and impacting his performance there.  *See Gorham*, Case No. 07.020H, at 12-13 ("It is clear to this hearing officer that the student's emotional and social difficulties both derived from his experiences at school, and significantly contributed to his inability to access her very superior cognitive potential[,]" as a result of which he had performed poorly in reading, writing, and spelling).

35.     Other cases on which the Parents rely likewise cannot fairly be read to buttress the proposition that, for eligibility purposes, it is immaterial whether adverse effect occurs in school. *See* Parents' Brief at 36-37 (citing *Independent Sch. Dist. No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 777 (8th Cir. 2001); *Benton*, 406 F. Supp.2d at 1266 n.25; *Mohawk Trail Reg'l Sch. Dist. v.*

*Shaun D. ex rel. Linda D*., 35 F. Supp.2d 34 (D. Mass. 1999)).  In those cases, as in *Gorham*, courts addressed whether the IEPs of students who already had been found eligible for special education adequately addressed problematic behaviors that were occurring outside of, but impacting, their performance in school.  *See A.C.*, 258 F.3d at 776-77 (rejecting district court's conclusion that social, emotional problems are necessarily segregable from learning process; noting, "If the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive in nature or that it causes the child even more trouble outside the classroom than within it.  What should control our decision is not whether the problem itself is 'educational' or 'non-educational,' but whether it needs to be addressed in order for the child to learn."); *Benton*, 406 F. Supp.2d at 1266 n.25 (noting, in case regarding whether IDEA eligible child had received a FAPE, "far from erecting an absolute barrier separating inappropriate home behaviors from school behaviors, *Gonz[á]lez* recognizes the symbiotic, interrelated connection between the two, and the obvious possibility that inappropriate behaviors at home may carry over into the educational context and interfere with a child's right to a FAPE unless managed via an IEP."); *Mohawk Trail*, 35 F. Supp.2d at 41 ("Like the child in *Abrahamson*, Shaun presents a unique case.  His out-of-school behavior was not only related to various recorded diagnoses, but was inextricably intertwined with his educational performance. As in *Abrahamson*, Shaun's need for residential care, as determined by the hearing officer, came about only upon finding that the minimal educational benefits to which Shaun was entitled could not be obtained in a day program alone; rather the kind of training he needed had to be given round-the-clock, thus necessitating placement in a residential facility.") (citation and internal punctuation omitted).[32]

---

[32] Tellingly, while courts have not hesitated to hold that an IEP must address out-of-school behaviors that impact a child's ability to progress at school, they have balked at mandating that an IEP address a child's ability to generalize

36.     For all of these reasons, the Parents fall short of making a persuasive case that the question of whether J.C.'s condition adversely affected her educational performance must be judged with reference to misconduct occurring outside of school, such as drinking, drugging, and promiscuous behavior.

37.     With this clarification, the Hearing Officer's ultimate conclusion can be deemed correct.  Even assuming *arguendo* that it is appropriate to look to Maine's current regulations to discern how Maine defined "educational performance" at the relevant times, and that the Hearing Officer therefore erred to the extent that she held that "educational performance" encompasses only the ability to learn, but not the ability to put learned concepts into practice, she nonetheless also ruled, more narrowly, that J.C.'s educational performance had not been affected because she suffered from a condition that led her to abuse drugs and alcohol and engage in other undesirable behaviors outside of school, but these mental health problems had not damaged her ability to succeed in school.  *See* Hearing Decision at 21.  The evidence bears out that conclusion.  J.C. performed well academically.  She had no attendance problems.  She worked very hard, completed her work, and worked well independently.  She was well-liked by peers and teachers. In school, she displayed excellent social skills, including abilities to transcend cliques and to assume leadership roles.  She generally presented in school as happy.  She had no difficulty communicating orally or in writing.

---

lessons learned at school outside of the school context. *See Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff & Julie P.*, __ F.3d ___, No. 07-1304, 2008 WL 3984361, at *5 (10th Cir. Aug. 29, 2008) (holding that student's IEP did not fail to provide him with a FAPE because it failed to address adequately his "inability to generalize functional behavior learned at school to the home and other environments"; noting, "The school district responds that, as a matter of law, generalization across settings is not required by IDEA so long as Luke can be said to be making some progress in school, and cites cases from the Eleventh and First Circuits, as well as various district courts, so holding. We are constrained to agree with the school district and our sister courts.") (footnote omitted).  The First Circuit case to which the court referred was *González*.  *See id.* at *5 n.7.  It also cited, *inter alia*, *Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289 (11th Cir. 2001), *see id.*, in which the United States Court of Appeals for the Eleventh Circuit observed: "[T]his circuit has specifically held that generalization across settings is not required to show an educational benefit[,]" *Devine*, 249 F.3d at 1293.

38.     While J.C. was disciplined when she was in the seventh and eighth grades, the District fairly characterizes her offenses of personal displays of affection, being rude to a substitute teacher, and going swimming at a school picnic as "minor."  District Brief at 31-32.  As the District points out, J.C. had no disciplinary incidents of any kind during her freshman year and parts of her sophomore and junior years when she attended York High School and when the PET was considering referral.  *See id*. at 32.  It is true that, in PET minutes cited by the Parents, *see* Parents' Brief at 35 n.6, Stevens was reported to have said that J.C.'s behavior could be "a bit erratic" during Stevens' first-period French class; she sometimes fell asleep and sometimes had too much energy; at times she was "a little self-isolating[;]" and she sometimes said things "in a startling way."  Record at 398, 462.  Nonetheless, Stevens also was reported to have described J.C. as "a great French student and a pleasure to have in class" and to have noted that she "always did quality work[,]" "never stepped over boundaries," and, most of the time, "engaged well in activities."  *Id*.  It is difficult in these circumstances to discern that J.C.'s condition, as serious as it was outside of school, and as understandably alarming to her parents, had even a slightly adverse effect on her educational performance.

39.     Nonetheless, even assuming *arguendo* that J.C.'s condition did adversely affect her educational performance, the Hearing Officer correctly held her ineligible because she did not need special education.  *See* Hearing Decision at 22-23.  As the District reasons, "The 'adverse effect' and 'need for special education' prongs are independent of each other.  A child could have some minor adverse effect and still be doing quite well in school academically, behaviorally, and functionally.  That child would not need special education to benefit[.]"  District Brief at 42 (footnote omitted); *see also, e.g.*, Garda at 490 ("[A] child that achieves a B+ in math instead of an A because of a disability fulfills the 'adversely affects' requirement but

does not 'need' special education, even if special education would help. Determining that a child's disability adversely affects educational performance simply does not answer the question of whether the child needs special education.") (footnote omitted).

40.      Despite concerns raised in middle school about J.C.'s conduct and affect, and the observations made at PET meetings by her 11th grade French teacher that she seemed sleepy and non-participatory and occasionally said startling things, it is clear that J.C. consistently performed strongly across all spheres in school, including academics, conduct, communication, citizenship, leadership, and social skills. Whatever the extent and scope of her needs generally, she did not need special education to benefit from the education offered her in public school. *See Katherine S. v. Umbach*, No. CIV.A. 00-T-982-E, 2002 WL 226697, at *10 (M.D. Ala. Feb. 1, 2002) (child did not need special education when she attended school regularly, had friends, participated in extracurricular activities, had slipping, but still passing, grades in accelerated courses, and her behavior problems and family conflict experienced at home were not reflected in her behavior in school); Garda at 511 ("[T]he free appropriate public education standard applied to eligible children supports finding that children passing yet performing poorly need special education. This standard appropriately eliminates average and above average performers from eligibility, an outcome that already finds virtually unanimous support from courts and hearing officers. Children able to compensate for their disability so that their educational performance (e.g., grades, attendance, behavior) is average to above average should not be eligible."). As the Hearing Officer noted, this independently disqualifies her from eligibility.

41.      Because the Hearing Officer correctly determined that J.C. was ineligible for special education services on the bases that her condition did not adversely affect her educational

performance or, alternatively, that she did not need special education, the District is not responsible for the costs of her unilateral placement at KGS.

### III.  Conclusion

For the foregoing reasons, I recommend that the instant appeal be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 25th day of September, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge